# EXHIBIT 2

# LICENSE AGREEMENT

**THIS LICENSE AGREEMENT** (the "Agreement") is entered into as of the 23rd day of February, 2011 by and between Taste of Nature, Inc., a California corporation with a principal place of business of 2828 Donald Douglas, Loop N., Suite A, Santa Monica, California 90405 (hereinafter "Licensor") and Provide Berries, Inc., a Delaware corporation with a principal place of business of 4840 Eastgate mall, San Diego, California 92121 (hereinafter "Licensee" or "Provide Berries") and a wholly owned subsidiary of Provide Commerce, Inc.

## RECITALS:

A.  Shari Candies, Inc., a Minnesota corporation ("Shari's Candies"), Shari's Berries, Inc., a California corporation ("Shari's Berries") and Shari's Berries International, Inc., a California corporation ("Shari's Berries Int'l") and Shari L. Fitzpatrick, an individual residing in California, previously entered into that certain Settlement Agreement, dated April 24, 2003 (the "Settlement Agreement"). Shari's Candies, Shari's Berries and Shari's Berries Int'l previously entered into that certain License Agreement, dated as of April 24, 2003 (the "Original License Agreement").

B.  Licensor acquired Shari Candies, including Shari Candies' rights and obligations under the Agreement, and Licensor was assigned, and accepted assignment of, all of Shari Candies' rights and obligations under the Agreement;

C.  Licensee acquired Shari's Berries Int'l, including Shari's Berries Int'l's rights and obligations under the Agreement, and Licensee was assigned, and accepted assignment of, all of Shari's Berries Int'l's rights and obligations under the Agreement;

D.  Licensor and Licensee desire to enter into another, new license agreement providing new rights and obligations between the parties to this Agreement;

E.  Licensor and Licensee desire to maintain the terms, provisions, rights and obligations of the Original License Agreement and the Settlement Agreement, which shall be valid and subsisting even after execution of this new, separate Agreement, except as specifically modified by the terms of this Agreement;

F.  In exchange for a one-time license fee in the amount of ▮▮▮▮ and reimbursement of Licensor's reasonable legal fees up to ▮▮▮▮, both payable by Licensee to Licensor at execution of this Agreement, Licensor agrees to grant Licensee the rights under the Agreement;

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants and premises hereinafter set forth, the parties agree as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.1** <u>Definitions</u>. Whenever used in this Agreement, the following capitalized terms have the following meanings:

BN 8292074v2

(a) **"Additional Licensed Products"** shall have the meaning set forth in Section 2.2.

(b) **"Affiliate"** shall mean, with respect to any entity, any other entity that directly or indirectly controls, is controlled by, or is under common control with, such entity. An entity shall be regarded as in control of another entity if it owns, or directly or indirectly controls, at least fifty percent (50%) of the voting stock or other ownership interest of the other entity, or if it directly or indirectly possesses the power to direct or cause the direction of the management and policies of the other entity by any means whatsoever.

(c) **"Ancillary Candy Products"** means Candy which is sold in combination with and ancillary to the sale of Chocolate Dipped Strawberries, Chocolate Dipped Fruit, Baked Goods, Chocolate Dipped Semi Dried Fruit, Chocolate Dipped Bottles, Chocolate Dipped Non-Fruit, Frozen Desserts, Popcorn, Specific Confections, Salty Samplers, Truffles, Chocolate Covered Espresso Beans and Coffee and is not the primary offering, subject to the following conditions:

> (i) The product offering must not contain Candy that is substantially similar to any Candy product sold by Licensor with the exception of jelly beans, Hershey's Kisses, strawberry candies, small foiled chocolates and candy corn; (ii) Licensee may not, directly or indirectly, have more than forty (40) SKUs containing Ancillary Candy Products being sold at any one time; and (iii) the Candy items in the product offering must be used solely as a decorative addition and must not be the primary offering. Licensee may include Ancillary Candy Products as part of giveaways or promotional gifts, which shall be specifically excluded from the SKU limitation set forth herein.

(d) **"Baked Goods"** means dipped or non-dipped baked goods, namely, (i) cookies, cakes, pies, cupcakes, brownies, dessert bars, pastries, doughnuts, muffins, scones, breads, biscuits, and petit fours and (ii) the baking mixes for any of the aforementioned.

(e) **"Candy"** means (i) candy, (ii) confectionery and processed food based on a sweetener to which other ingredients are added; and (iii) ingredients for candy, but shall exclude Baked Goods, Chocolate Covered Espresso Beans, Chocolate Dipped Fruit, Chocolate Dipped Semi Dried Fruit, Chocolate Dipped Dried Fruit, Chocolate Dipped Strawberries, Chocolate Dipped Bottles, Chocolate Dipped Non-Fruit, Coffee, Cookies, Frozen Desserts, Popcorn, Salty Samplers, Specific Confections and Truffles.

(f) **"Chocolate Covered Espresso Beans"** means espresso coffee beans covered with chocolate, caramel, butterscotch or other similar spreadable or hard drying edible liquid coverings.

(g) **"Chocolate Dipped Fruit"** means fresh or frozen fruit (other than Chocolate Dipped Strawberries) dipped or covered in chocolate, caramel, butterscotch, yogurt,

peanut butter or other similar coverings or flavored coating with or without additional toppings such as coconut, chocolate chips, sprinkles, almonds, nuts or other similar toppings, but no other Candy items.

(h) **"Chocolate Dipped Semi Dried Fruit"** means semi dried or dried fruit dipped or covered in chocolate, caramel, butterscotch, yogurt, peanut butter or other similar spreadable or hard drying edible liquid coverings with or without additional toppings such as coconut, chocolate chips, sprinkles, almonds, nuts or other similar toppings, but no other Candy items.

(i) **"Chocolate Dipped Strawberries"** means fresh or frozen strawberries dipped or covered in chocolate, caramel, butterscotch, yogurt, peanut butter or other similar spreadable or hard drying edible liquid coverings with or without additional toppings such as coconut, chocolate chips, sprinkles, almonds, nuts or other similar toppings, but no other Candy items.

(j) **"Chocolate Dipped Bottles"** means bottles, containing consumable beverages such as wine and champagne, that have been dipped or covered in chocolate, caramel, butterscotch, yogurt, peanut butter or other similar spreadable or hard dying edible liquid coverings. The coating must be decorative and surrounding a portion of the bottle. The coating must be ancillary to the sale of the beverage and not the primary offering.

(k) **"Chocolate Dipped Non-Fruit"** means non-fruit items, namely, cookies, coffee and espresso beans, pretzels and marshmallows, partially dipped or covered in chocolate, caramel, butterscotch, yogurt, peanut butter or other similar coverings or flavored coating with or without additional toppings such as coconut, chocolate chips, sprinkles, almonds, nuts or other similar toppings, provided however, "Chocolate Dipped Non-Fruit" shall exclude Candy.

(l) **"Coffee"** means coffee beans, either whole or ground, sold for the purpose of making brewed coffee.

(m) **"Cookies"** means cookies, including cookies partially dipped or covered in chocolate, caramel, butterscotch or similar spreadable or hard drying edible liquid coverings.

(n) **"Frozen Desserts"** means (i) frozen desserts, namely, ice cream, frozen yogurt, sorbet and gelato; and (ii) sauces, coverings and toppings for frozen desserts, including, but not limited to, hot fudge, caramel, chocolate, and marshmallow.

(o) **"Licensed Mark"** means the mark SHARI, including the SHARI's variation thereof, licensed for use in accordance with the limitations set forth in Section 2.3.

(p) **"Licensed Products"** means the Ancillary Candy Products, Baked Goods, Chocolate Covered Espresso Beans, Chocolate Dipped Semi Dried Fruit, Chocolate Dipped Bottles, Chocolate Dipped Non-Fruit, Frozen Desserts, Popcorn, Salty Samplers, Specific Confections and Truffles.

(q) **"Licensee's Mark"** means the mark, U.S. Trademark Registration No. 3783282, "Shari's Berries."

(r) **"Permitted Uses"** means the Licensed Mark used with the following additional literal elements: "Sweets," "Bakery," "Cookies," "Brownies," "Cakes," Chocolates," "Popcorn," "Favorites," "Picks," "Specials," "Recommends," "Choice," and "Selection," all subject to the limitations set forth in Section 2.3.

(s) **"Popcorn"** means popcorn.

(t) **"Proposed New Use"** shall have the meaning set forth in Section 2.3.

(u) **"Salty Samplers"** means savory samplers consisting of nuts, pretzels or other similar salty snacks, packaged in a gift basket.

(v) **"Specific Confections"** means (i) chocolates; (ii) caramels; (iii) barks; (v) fudge; (vi) brittle; and (vii) toffee

(w) **"Truffles"** means chocolate truffles.

## ARTICLE 2
## LICENSE GRANT

**Section 2.1** **License Grant.** Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee a non-exclusive worldwide right to use the Licensed Mark with the Permitted Uses, as provided in Section 2.3 of this Agreement, in connection with the sale, marketing and advertising of the Licensed Products and Chocolate Dipped Strawberries, Coffee and Chocolate Dipped Fruit.

**Section 2.2** **Licensed Mark on Additional Licensed Products.** Subject to the terms and conditions of this Agreement, and without limiting any other rights or obligations related to the Licensed Mark, Licensor hereby grants to Licensee a non-exclusive worldwide right to use the Licensed Mark, subject to the limitations of Section 2.3 of this Agreement, in connection with the sale, marketing and advertising of the following additional products, which shall collectively be referred to as the **"Additional Licensed Products"**:

(a) Baked Goods;

(b) Fresh or frozen fruit (other than Chocolate Dipped Strawberries) dipped or covered in yogurt, peanut butter or other similar flavored coating with or without additional toppings, such as coconut, chocolate chips, sprinkles, almonds, nuts or other similar toppings, but no other Candy items;

(c) Semi dried or dried fruit dipped or covered in yogurt or peanut butter with or without additional toppings such as coconut, chocolate chips, sprinkles, almonds, nuts or other similar toppings, but no other Candy items;

(d)     Chocolate Dipped Non-Fruit;

(e)     Frozen Desserts;

(f)     Popcorn;

(g)     Salty Samplers; and

(h)     Specific Confections

Notwithstanding the additional use of the Licensed Mark with the Additional Licensed Products, as provided for in this Section 2.2, Licensee shall continue to have all rights provided for in the Original License Agreement.

**Section 2.3**     **Limitation on License.** Licensee has no right to and agrees that it will never use the word "Shari" or "Shari's" alone or in combination with any other words, other than as the Licensee's Mark and/or the Licensed Mark with the Permitted Uses on any goods or services sold pursuant to this Agreement. The parties agree that in all uses of the Licensed Mark and/or the Licensed Mark with the Permitted Uses as allowed for herein, "Shari" or "Shari's" will be the first word followed by the second word provided for by Licensee's Mark and/or Licensed Mark with the Permitted Uses (e.g. "Shari's Berries," "Shari's Sweets," "Shari's Bakery," "Shari's Cookies," "Shari's Brownies," "Shari's Cakes," "Shari's Chocolates," "Shari's Popcorn," "Shari's Favorites," "Shari's Picks," "Shari's Specials," "Shari's Recommends," "Shari's Choice" and "Shari's Selection"). The parties agree that, from time to time, Licensee may propose other "Shari's xxxxx" marks, consisting of "Shari's" plus an additional literal element(s) (a **"Proposed New Use"**). In the event Licensor provides its written approval of a Proposed New Use, the then approved Proposed New Use shall be automatically included as a Permitted Use, subject to the terms and conditions of this Agreement. Any decision as to the approval or disapproval of a Proposed New Use shall be in Licensor's sole and absolute discretion and subject to the restrictions set forth in Section 2.4 hereof. Licensee shall not use any Proposed New Use unless and until Licensor provides its express written approval. Licensor shall use its best efforts to timely provide its approval or disapproval for a Proposed New Use.

**Section 2.4**     **Appearance of Marks.**

(a)     Subject to the approval procedures set forth herein, Licensee shall be authorized to use any appearance for the Licensee's Mark and the Licensed Mark on any goods or services allowed pursuant to this Agreement, the Original License Agreement and the Settlement Agreement, including, without limitation, any script, style, font type, color scheme and placement; provided, however, Licensee must, in connection with any of the Licensed Products and/or Additional Licensed Products sold pursuant to this Agreement, the Original License Agreement or the Settlement Agreement use the Licensed Mark with no intervening language and each word comprising each use of the Licensed Mark with the uses provided for in the Original License Agreement and Settlement Agreement, including Licensee's Mark, and the Permitted Uses pursuant to this Agreement will both be displayed with equal prominence, at all times (e.g. "Shari's" will be displayed with no intervening language and with equal prominence as "Sweets"). However, Licensee shall never

use any stylization in connection with the Licensed Mark, Licensee's Mark, any Permitted Use, the Licensed Products or any Additional Licensed Product that is similar to any stylization used by Licensor in connection with Licensor's Mark, including, but not limited to, Crillee Italic font. Prior to the use of Shari's Sweets, Shari's Favorites, Shari's Picks, Shari's Specials, Shari's Recommends, Shari's Choice and/or Shari's Selection (the **"Select Permitted Uses"**) on any goods or services allowed pursuant to this Agreement, Licensee shall seek Licensor's written approval of the stylization of that use of the Select Permitted Uses. Licensor's approval of a proposed stylization of the Licensed Mark with the Select Permitted Uses shall not be unreasonably withheld. Licensor shall provide its approval or disapproval of a proposed stylization within ten (10) business days of receipt. The parties specifically acknowledge and agree that Licensor's unreasonable disapproval of a proposed stylization shall be a material breach of this Agreement. For the avoidance of doubt, the parties agree as follows:

  i. A stylization will not be rejected if it is not similar to Licensor's stylization of Licensor's mark using a standard not greater than substantial and/or confusing similarity and if it is otherwise in conformity with the terms herein.

  ii. A stylization will not be rejected if it uses the font used by Licensee in connection with Licensee's Mark as of the date of execution of this agreement, or a substantially similar version thereof, and if it is otherwise in conformity with terms herein.

(b) In the event that Licensee is unable to receive approval of any stylization for "Shari's Sweets," in compliance with the terms of this Agreement, on or before December 31, 2011, provided, that Licensee has submitted its proposed stylization for "Shari's Sweets" at least ten (10) business days prior to December 31, 2011, then Licensee shall have the option, in its sole discretion, to (i) continue discussions with Licensor on obtaining approval of stylization for "Shari's Sweets"; or (ii) terminate this Agreement. Licensee shall provide any notice of termination within five (5) business days after December 31, 2011. In the event that Licensee determines to terminate this Agreement pursuant to this Section 2.4(b), the parties agree as follows:

  i. the Original License Agreement and the Settlement Agreement shall continue in full force and effect without regard to any terms contained in this Agreement;

  ii. Licensor shall refund the Licensee Fee set forth in Section 6.1 of this Agreement less (A) any unpaid royalty obligations that would have been owed by Licensee to Licensor for the period ending March 31, 2011 had this Agreement not been executed; and (B) $13,500;

  iii. Licensee shall be obligated to make any royalty payments to Licensee for the period April 1, 2011 to March 31, 2012 according to the terms

        of the Original License Agreement on or before April 30, 2012 and all future royalty payments due therein as set forth in the Original License Agreement; and

    iv.    subject to the terms in this Section 2.4(b)(iv), the rights granted to Licensee herein shall terminate with immediate effect; provided, however, that to the extent Licensee is marketing or offering products pursuant to the terms of this Agreement on December 31, 2011, Licensee shall have forty-five (45) days to continue such use pursuant to the terms of this Agreement (the "**Phase-out Period**"). Licensee agrees that all rights granted to Licensee shall terminate immediately at the end of the Phase-out Period.

(c)    In the event that Licensee does not submit a proposed stylization for "Shari's Sweets" on or before ten business days prior to December 31, 2011, then Licensor shall, in its sole discretion, have the option of (i) continuing with the terms of this Agreement; or (ii) providing notice to Licensee within five (5) business days after December 31, 2011 that it is terminating this Agreement, subject to the terms and obligations set forth in Sections 2.4(b)(i), (ii), (iii) and (iv).

    **Section 2.5**    **Sublicense.** Licensee may sublicense the rights in Section 2.1 and/or 2.2 to a third party only in connection with (i) such third party providing marketing services on behalf of Licensee or any of its Affiliates directly related to and on behalf of the Licensed Products or any Additional Licensed Product; and (ii) the operation of stand alone retail stores or franchises selling the Licensee's line of products if (a) in the case of subsection (ii) of this Section 2.5, the Licensee notifies Licensor, in writing, in advance of each sublicense; (b) in the case of subsection (i) and (ii) of this Section 2.5, the sublicensee agrees, in writing to be bound by a sublicense agreement consistent with the terms and provisions of this Agreement; and in the case of subsection (i) and (ii) of this Section 2.5, the sublicense is not a direct competitor of Licensor's. No sublicensee shall have the right to license any further use of the Licensed Mark. Licensee may only sublicense the rights specifically set forth in this Agreement and may not sublicense or otherwise allow any (y) use of the Licensed Mark in a way that is not in strict compliance with the terms of this Agreement or (z) use of the word "Shari" or variants thereof other than as a Licensed Mark.

    **Section 2.6**    **Licensor's Rights.** Notwithstanding any provision herein to the contrary, Licensee acknowledges and agrees that Licensor may use and license others to use any mark (including Licensor's Mark) containing or consisting of the word "Shari", including, without limitation, a use or license to sell the Licensed Products, provided however that Licensor will not (i) license the right to use the Licensee's Mark or Licensee's Mark in combination with any Permitted Use to any third party in connection with the Licensed Products or Additional Licensed Products; (ii) use the Licensee's Mark or Licensee's Mark in combination with any Permitted Use in connection with the Licensed Products or any Additional Licensed Products or (iii) advertise, market or sell Chocolate Dipped Strawberries, Chocolate Dipped Fruit or Coffee or license others to sell Chocolate Dipped Strawberries, Chocolate Dipped Fruit or Coffee using the Licensed Mark or the Licensed Mark with any Permitted Use.

BN 8292074v2

7

## ARTICLE 3
## TERM AND TERMINATION

**Section 3.1** **Term.** Subject to termination as provided in Section 3.2 below, the term of this Agreement shall be perpetual (the "Term").

**Section 3.2** **Termination.** This Agreement and the licenses granted hereunder may be terminated by Licensor, with respect to Licensee, in the event:

(a) That Licensee fails to comply with any material terms or provisions of this Agreement which breach is not cured within thirty (30) days of receipt of written notice from Licensor;

(b) That Licensee breaches the terms or provisions of the Original License Agreement or the Settlement Agreement taking into consideration the terms of this Agreement;

(c) That Licensee makes an assignment for the benefit of its creditors, files or has filed against it any petition under any bankruptcy, insolvency or other similar law, is adjudicated bankrupt or insolvent, or if any trustee in bankruptcy or insolvency is appointment for it;

(d) That Licensee ceases business operations for a period in excess of six (6) months excluding any dissolution or ceasing of business in connection with an assignment permitted under Section 8.3; or

(e) That Licensee attacks the title, or any rights of Licensor, in and to, or the validity of, the Licensed Mark.

**Section 3.3** **Certain Effects of Expiration/Termination.** Upon termination of this Agreement for any reason, Licensee agrees that it shall: (i) immediately cease and desist from utilizing the Licensed Mark or any mark or name confusingly similar thereto, or any mark or name confusingly similar to Licensor's Mark on Licensed Products or Additional Licensed Products; (ii) unless otherwise instructed by Licensor, promptly deliver to Licensor, at the Licensee's sole expense, all descriptive material and advertising utilizing any of the Licensed Mark on the Licensed Products and/or Additional Licensed Products; and (iii) unless otherwise instructed by Licensor, promptly execute any documents which may be reasonably necessary to release, surrender or return the Licensed Mark to Licensor (in each case, subject to any rights in the Settlement Agreement or Original License Agreement).

## ARTICLE 4
## OPERATIONS

**Section 4.1** **General; High Quality.** Licensee acknowledges and agrees that, at all times during the Term, the quality of the Licensed Products and Additional Licensed Products produced hereunder by Licensee shall be consistent with the standards of quality of such products currently sold by Licensee and the means and manner of sale of the Licensed Products and Additional Licensed Products shall be consistent in quality with those currently employed by Licensee.

**Section 4.2** **Compliance with Laws.** Licensee shall: (i) comply in all material respects with all laws, rules, regulations and requirements of any governmental body in the United States which may be applicable to the operation, advertising and promotion of the Licensed Products and Additional Licensed Products including, but not limited to, health and safety laws; and (ii) secure from the appropriate authorities, at its own expense, all permits, licenses, concessions or other documents required by law in connection with the operation, advertising and promotion of the Licensed Products and Additional Licensed Products. No approval by Licensor of any items hereunder will be deemed to limit or modify any of Licensee's obligations under this Section 4.2.

**Section 4.3** **Usage; Requirements; Change.** Licensee shall not use on the Licensed Products, Additional Licensed Products, or in connection with the sale thereof, any item so nearly resembling the Licensed Mark or the Licensed Mark with any Permitted Use as to be likely to cause deception or confusion. Licensee shall not use on the Licensed Products, Additional Licensed Products or in connection with the sale thereof, the Licensed Mark or the Licensed Mark with any Permitted Use in any manner whatsoever in combination with any other mark primarily associated with Candy, unless otherwise specifically agreed to in advance in writing by Licensor in the exercise of Licensor's sole discretion. Licensee has no obligation to maintain any legend or other notification of any kind on any of its or its Affiliates websites related to this Agreement, the Original License Agreement or the Settlement Agreement.

**Section 4.4** Inspection.

(a) Upon reasonable written notice, Licensor shall have the right to request inspection samples of Licensed Products and/or Additional Licensed Products being sold by Licensee for the purpose of determining whether the standards of quality required by this Agreement have been maintained, but no more frequently than once every twelve (12) months. Notwithstanding the foregoing, not more than (1) time per year, Licensor may request, and Licensee shall provide, one sample of each distinct item, as applicable, being offered for sale by Licensee under the Licensed Mark and/or the Licensed Mark with the Permitted Uses.

(b) Licensor shall notify Licensee of any perceived material discrepancy regarding whether the standards of quality required by this Agreement have been maintained by a Licensee, and upon receipt of such notice, the parties agree to work in good faith toward correcting any such discrepancies.

### ARTICLE 5
### PROTECTION OF PROPRIETARY RIGHTS

**Section 5.1** **Ownership.** Licensee expressly acknowledge and agree that: (i) as between Licensor and Licensee, Licensor owns the exclusive right, title and interest in and to the Licensed Mark and Licensee shall not represent in any manner that it has any ownership rights therein; (ii) use by Licensee of the Licensed Mark shall not create in Licensee any right, title or interest in or to the Licensed Mark; and (iii) any and all goodwill associated with the Licensed Mark or arising from Licensee's use of the Licensed Mark on the Licensed Products and/or the Additional Licensed Products shall inure exclusively to the benefit of Licensor, and Licensee shall have no claim for compensation for any part of the goodwill attributable to Licensee's use of the Licensed Mark.

Nothing in this Agreement, however, shall affect Licensee's rights in and to the marks "Shari's Berries" or "Shari's Bear'ys" as set forth in the Settlement Agreement.

As long as Licensee is in compliance with the terms of this Agreement and the terms of the Original License Agreement and the Settlement Agreement, Licensor agrees that it will not hereafter contest the validity of or oppose the registration of Licensee's Mark or take any action against the use or registration in various states or the U.S.P.T.O. for additional trademarks consisting of only the words "Shari's Berries" used solely in connection with Chocolate Dipped Strawberries, Chocolate Dipped Fruit or Coffee.

**Section 5.2** **No Adverse Action.** Licensee shall not do anything or suffer anything to be done which may adversely affect any rights of Licensor in and to the Licensed Mark.

**Section 5.3** **Infringements.** Licensee shall immediately notify Licensor of all applications for registration of, and registrations of, marks that prominently feature the word "Shari" for Candy, and all known infringements, illegal uses or misuses of the Licensed Mark on Candy which come to Licensee's attention; provided, however, Licensee shall have no obligation to police or enforce the Licensed Mark.

**Section 5.4** **Litigation.** Licensor shall have the right, but not the obligation, to take action against others in the courts, administrative agencies or otherwise, to prevent infringement, imitation, illegal use or misuse of the Licensed Mark and to oppose or cancel applications or registrations of trademarks or service marks which conflict with the Licensed Mark. Licensee agrees, at Licensor's cost, to reasonably cooperate with Licensor in connection with any such action by Licensor and, upon Licensor's request, to execute, file and deliver all documents and proof desired by Licensor in connection therewith. In the event Licensor does not pursue action in courts, administrative agencies or otherwise to prevent infringement, illegal use or misuse of the Licensed Mark in a manner within the scope of this Agreement, Licensee shall have the right to take such action, at its sole cost and expense. However, in no event shall Licensee enter into a settlement or other resolution of an action involving the Licensed Mark without Licensor's prior informed written consent, which shall not be unreasonably withheld.

**Section 5.5** **Damages.** Any damages recovered by Licensor by virtue of any action it undertakes to enforce and protect the Licensed Mark shall be the sole property of Licensor.

### ARTICLE 6
### LICENSE FEE

**Section 6.1** **License Fee.** [REDACTED] The License Fee shall also include and represent payment in full satisfaction of any royalties or other fees as may be owed pursuant to the Original License Agreement since Licensee last provided payment to Licensor. Licensee shall no longer have an obligation to pay any annual royalty to Licensor, including any royalty pursuant to Section 6.1(a) and 6.1(b) to the Original License Agreement, from and after the effective date of this Agreement. Further, Licensee shall no longer have any obligation provide any royalty statement pursuant to Section 6.1(c) of the Original License Agreement.

## ARTICLE 7
## ALTERNATIVE DISPUTE RESOLUTION ("ADR"); BINDING ARBITRATION

**Section 7.1** **ADR.** The parties have entered into this Agreement in good faith and in the belief that it is mutually advantageous to them. It is the same spirit of cooperation they pledge to attempt to resolve any dispute amicably without the necessity of litigation. Accordingly, they agree if any dispute arises between them relating to the Agreement (a "Dispute"), that they will, except as provided in Section 7.3, first utilize the procedures specified in this Article (the "Procedure") prior to any additional proceedings.

**Section 7.2** Initiation of Procedure.

(a) **Direct Negotiations.** If a Dispute arises between Licensor and Licensee relating to the Agreement, the aggrieved party shall give notice of the dispute to the other describing in detail the nature of the Dispute (the "Dispute Notice"). For a period of not less than thirty (30) days following the date of the Dispute Notice, the parties involved in the Dispute shall directly negotiate a resolution of the Dispute.

(b) **Selection of a Mediator.** If the parties are unable to resolve the Dispute by direct negotiation, then the parties involved in the Dispute shall select a qualified mediator. If the parties are unable to agree on the selection of a qualified mediator, one shall be selected by the senior federal district court judge for the Central District of California. All fees for the mediator shall be paid equally by the parties to the mediation.

(c) **Time and Place of Mediation.** The mediation shall take place at a time and place in Los Angeles, California as mutually agreed to by the parties involved in the Dispute, but in no event more than forty-five (45) days following the end of the direct negotiation period.

(d) **Exchange of Information.** Not less than ten (10) days before the mediation the parties involved in the Dispute shall provide the mediator and each other with information and documents sufficient to describe the issues and law involved in the Dispute and a summary of their views.

(e) **Parties to be Represented.** The parties involved in the Dispute may be represented by counsel of their choosing at the mediation, the costs of which shall be borne by the party being represented.

(f) **Termination of Procedure.** If, following the mediation, the parties involved in the Dispute have not successfully resolved the Dispute, the Procedure shall be deemed complete and the aggrieved party may proceed in accordance with the provisions of Section 7.2(g)

(g) **Mandatory Venue.** If the Dispute is not resolved by the Procedure, any action to resolve the Dispute shall be venued in any state court or federal court in the County of Los Angeles.

**Section 7.3** **Injunctive Relief.** Notwithstanding the provisions of this Article 7, Licensor may, at it election, in lieu of or in addition to the Procedure, seek injunctive relief to enjoin a Licensee's breach of this Agreement. Licensee acknowledges that the remedies at law for any breach of this Agreement are inadequate and that the damages resulting from any such breach will not be readily susceptible to being measured in monetary terms. Accordingly, Licensee acknowledges that upon its breach of any of the terms and conditions of this Agreement, Licensor will be entitled to immediate injunctive relief and to obtain an order restraining any threatened or future breach. Nothing in this Section 7.3 will be deemed to limit, in any way, the remedies at law or in equity of either party, for a breach of any of the provisions of this Agreement.

**Section 7.4** **Attorney's Fees.** The prevailing party in any action commenced under Sections 7.2(f); 7.3(g) and/or 7.3 shall be awarded its costs and disbursements incurred therein, including reasonable attorneys' fees.

## ARTICLE 8
## MISCELLANEOUS

**Section 8.1** **Limited Representations and Warranties by Licensor.** Licensee expressly acknowledges that Licensor has not, except as specifically provided in this Section 8.1, made, and is not making, any representation or warranty with respect to the Licensed Mark, including in respect of Licensor's ownership of, or Licensee's right to use, the Licensed Mark in connection with any products or services. Licensor makes the following limited representations and warranties: (i) Licensor is the owner of U.S. Trademark Registration No. 1,864,816 for the mark SHARI; (ii) Licensor has the right, power and authority to enter into this Agreement and perform its obligations hereunder; and (iii) Licensor has not granted an exclusive license to any other person to use the Licensed Mark on the Licensed Products or Additional Licensed Products or otherwise entered into any agreement or commitment that would materially impair or interfere with Licensee's ability to exercise the rights granted herein.

**Section 8.2** **Indemnification.** Licensee shall indemnify, defend and hold Licensor, its affiliates, subsidiaries, licensees and assigns, and each of their directors, partners, officers, employees and agents harmless during and after the term hereof from and against all claims, suits, liabilities, damages and expenses (including reasonable legal fees) incurred as a result of such Licensee's breach of its obligations hereunder or under the Settlement Agreement, or caused in whole or in part by such Licensee's acts or omissions, including such Licensee's operation of its business or sale of the Licensed Products or Additional Licensed Products.

**Section 8.3** **Assignment.** Except as provided in Section 2.5 hereof, neither this Agreement nor any rights, licenses or duties hereunder shall be assignable, delegable, or transferable, whether by assignment, sublicense or otherwise, directly or indirectly, by Licensee without the prior written consent of Licensor, not to be unreasonably withheld, and any such attempted assignment, delegation, transfer or sublicense without Licensor's prior written consent shall be null and void. Notwithstanding the foregoing prohibition of this Section 8.3, Licensee may assign its rights and obligations under this Agreement to any Affiliate or a successor in interest by merger, acquisition or consolidation or a purchaser of all or substantially all of the assigning Licensee's business or assets, if prior to such assignment (i) notice of the proposed assignment is given to Licensor and (ii) such successor in interest agrees, in writing, to be bound by the terms and

conditions of this Agreement. For purposes of this Section 8.3, a sale or disposition of fifty percent (50%) or more of the equity ownership of Licensee shall constitute an assignment of this Agreement. This Agreement and Licensor's rights and obligations hereunder shall be freely assignable by Licensor. If approved, no assignment will release Licensee from its obligations hereunder. Subject to the foregoing, this Agreement shall inure to the benefit of and be binding upon the parties' respective successors or assigns.

**Section 8.4** **Expenses.** Each party shall be responsible and bear its own expenses and fees (including legal, travel and other fees) in connection with this Agreement; provided, however, that Licensee agrees to pay the reasonable, actual and documented fees of one legal counsel to Licensor in connection with the initial review, negotiation and execution of this Agreement up to a maximum amount of ▮.

**Section 8.5** **Entire Agreement.** This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements, representations and warranties. The parties specifically acknowledge and agree that this Agreement is a stand alone license agreement and distinct from the Settlement Agreement and the Original License Agreement, and that the Settlement Agreement and the Original License Agreement are valid and subsisting agreements between the parties and shall be and remain in full force and effect in accordance with the respective terms except as may be modified by the terms of this Agreement. The execution, delivery, and performance of this Agreement shall not operate as a waiver of, or as an amendment of, any right, power, or remedy of the parties pursuant to the Settlement Agreement and Original License Agreement, as in effect prior to the date hereof. This Agreement may be amended only by written agreement executed by the parties. Except as expressly set forth herein, in the event of any conflict between this Agreement and the Settlement Agreement and/or Original License Agreement, the terms of the Settlement Agreement and/or Original License Agreement shall take precedence and govern. Notwithstanding the foregoing, the parties specifically agree that in the event of a conflict between this Agreement and the Settlement Agreement and/or Original Licensee Agreement with respect to the provisions of the following specific paragraphs, the terms of this Agreement shall take precedence and govern with respect to those provisions only: Section 2.4; Section 2.5; Section 2.6; Section 4.4(a); Section 5.4; Section 6.1; Section 7.2(b); Section 7.2(c); Section 7.2(g); Section 8.5, Section 8.6 and Section 8.8.

**Section 8.6** **Governing Law; Submission to Jurisdiction.** This Agreement shall be governed by the laws of the State of California without regard to its conflicts of law rules. Each of the parties submits to the jurisdiction of any federal or state court sitting in the County of Los Angeles in any action or proceeding arising out of or related to this Agreement and hereby waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought.

**Section 8.7** **Severability.** Should any part of this Agreement be determined to be invalid, illegal or unenforceable, all other provisions of the Agreement shall remain enforceable and the parties shall negotiate to replace such invalid, illegal or unenforceable provision with a provision which effects to the extent possible the original intent of such provision.

**Section 8.8** **Notice.** All notices and other communications provided for hereunder shall be in writing and shall be personally delivered, sent by facsimile or mailed, certified or registered,

return receipt requested, to each party, at its address set forth beside its name below or at such other address as may be designated by such party in written notice to each of the other parties. All such notices and communications shall be effective when delivered in person or transmitted by facsimile or two (2) days after dispatch by certified or registered first class mail, postage prepaid, return receipt requested, to the party to whom the same is so given or made:

| | |
|---|---|
| If to Licensor: | Taste of Nature, Inc.<br>2828 Donald Douglas Loop North, Suite A<br>Santa Monica, CA 90405<br>Attn: Scott Samet<br>Facsimile No.: 310-396-4432 |
| With a copy to: | Donald S. Lee, Esq.<br>Buchalter Nemer, A Professional Corporation<br>1000 Wilshire Blvd., Suite 1500<br>Los Angeles, California 90017 |
| If to Licensee: | Provide Berries, Inc.<br>4840 Eastgate Mall<br>San Diego, CA 92121<br>Attention: General Counsel<br>Facsimile: (858) 638-4708 |
| With a copy to: | DLA Piper LLP (US)<br>4365 Executive Drive, Suite 1100<br>San Diego, CA 92121<br>Attention: Larry W. Nishnick<br>Facsimile: (858) 638-5014 |

**Section 8.9**  **Headings.**  Headings of paragraphs herein are for convenience of reference only and are without substantive significance.

**Section 8.10**  **Waivers.**  A waiver of any breach of any of the provisions of this Agreement shall not be construed as a continuing waiver of other breaches of the same or other provisions hereof.

*THE REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK*

Section 8.11  **Counterparts**. This Agreement may be executed by the parties hereto in one or more counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have signed and delivered this Agreement as of the date first above written.

**TASTE OF NATURE, INC.**

Signed: _[signature]_

Printed Name: Scott Smet

Title: co-President

**PROVIDE BERRIES, INC.**

Signed: _[signature]_

Printed Name: STEVEN GOLDSTEN

Title: SENIOR VICE PRESIDENT